Glenda F. COOLEY,

Mary A. Tate Campbell,

Barbara G. Myers,

Joyce Ann Layne Rollins,

Connie Rancene Kilgore Parson Dykes,

Georgia Ruth Nolan Henry, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. CIV-1-88-100 to 1-88-105.

United States District Court,
E.D. Tennessee,
at Chattanooga.

March 31, 1992.

Stephen T. Greer, J. Curtis Smith, Dunlap, Tenn., and William E. Shofner, Joseph A. Woodruff, Waller, Lansden, Dortch, Nashville, Tenn., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Robin D. Smith, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

EDGAR, District Judge.

On December 8, 1981, Danny J. Cooley, Jackie O. Tate, Charles R. Myers, Darrell Glen Rollins, Gaylon L. Parson, and Har-

vey J. Nolan, Jr. accidentally died in a methane gas explosion while working in an underground coal mine operated by their employer, the Grundy Mining Company, in Marion County near Whitwell, Tennessee. Plaintiffs are the widows and duly appointed administratrix of the estates of the deceased coal miners. Plaintiffs have brought these causes of action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 ("FTCA"), seeking to recover compensatory damages for wrongful death and loss of consortium.

Plaintiffs allege that employees of the Federal Mine Safety and Health Administration ("MSHA"), an agency of the United States, were negligent in their inspection and regulatory enforcement activities in the coal mine where the explosion occurred. Plaintiffs claim that the deceased miners relied on MSHA employees to perform their mandatory government duties in a non-negligent manner, and that the negligent performance of the alleged mandatory duties was a proximate cause of the explosion and the resulting deaths. More specifically, plaintiffs complain that MSHA employees were negligent in approving unsafe and inadequate air ventilation plans for the mine, failing to provide a minimum number of spot safety inspections, failing to adequately inspect the mine for safety violations, failing to timely order the withdrawal of the miners from the mine to avoid the dangerous accumulation of explosive methane gas, and failing to issue adequate citations to the mine operator for existing safety violations. Plaintiffs premise their claims on two different theories of tort liability: negligence *per se* and the Good Samaritan Doctrine as embodied in the *Restatement (Second) of Torts* §§ 323 and 324A.

Defendant has filed motions in these consolidated cases to dismiss the complaints in their entirety on the ground of lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1) or, in the alternative, to dismiss the complaints under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Court File No. 4). Defendant contends, *inter alia,* that this Court lacks subject matter jurisdiction be- cause the plaintiffs' claims are barred by the doctrine of sovereign immunity under the discretionary function exception of the FTCA. 28 U.S.C. § 2680(a).

## I. STANDARD OF REVIEW

A motion by the United States to dismiss a complaint filed against it pursuant to the FTCA on the ground that the plaintiff's claim is barred by the doctrine of sovereign immunity under the discretionary function exception is properly treated as a motion to dismiss for lack of subject matter jurisdiction. *Moffitt v. United States,* 430 F.Supp. 34, 37 (E.D.Tenn.1976); *see also In re Ohio River Disaster Litigation,* 862 F.2d 1237, 1244 (6th Cir.1988), *cert. denied,* 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989) ("The question whether the discretionary function exception shields the government from liability is one of subject matter jurisdiction.").

Motions to dismiss for lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1) generally come in two varieties. First, a *facial* attack on the basis for subject matter jurisdiction alleged in a complaint merely questions or tests the sufficiency of the pleading. In considering such facial attacks, the correct standard of review for a trial court is to take the allegations of fact in the complaint as being true. *Ohio Nat. Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990). On the other hand, when a court reviews a complaint which is under *factual* attack by a defendant, the allegations of fact in the complaint are not presumed to be true. If there is a factual dispute, the district court must weigh the conflicting evidence to determine whether jurisdiction exists. The district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary to resolve disputed jurisdictional facts. *Id.* This Court can and will consider affidavits and other documents outside the pleadings in ruling on the motion under Rule 12(b)(1) without thereby converting the motion into one for summary judgment. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert.*

*denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Jackson v. Ohio Bell Tel. Co.,* 555 F.Supp. 80 n. 1 (S.D.Ohio 1982); *cf. Ohio Nat.,* 922 F.2d at 325.

## II. STATEMENT OF GEORGE FESAK

Defendant has presented a limited factual attack on certain allegations of fact made in three paragraphs of the complaints. Defendant has submitted the sworn declaration of George Fesak ("Fesak") as Attachment E to its reply memorandum which was filed on August 3, 1988. Fesak states he has been employed by MSHA and its predecessor agencies for over 17 years. His title is supervisory electrical engineer and his duties include supervision of the Program Accountability Group within the Division of Safety, Coal Mine Safety and Health. Fesak states he is familiar with the various editions of MSHA's internal procedures manuals and the March 9, 1978 edition of the MSHA Citation and Order Manual is the one that was in effect at the time of the mine explosion on December 8, 1981. Fesak further states:

> 4. Paragraph 22 of all of the above complaints purports to quote language from the March 9, 1978 version of MSHA's Citation and Order Manual. After due inquiry, I have discovered that the quoted language appearing in ¶ 22 is not contained in the March 9, 1978 Manual. Instead, this language comes from the edition of MSHA's Citation and Order Manual that became effective on November 1, 1982.

> 5. Paragraph 32 of all of the above Complaints other than the Complaint filed by Mrs. Glenda Cooley purports to cite and quote language from page 13 of an MSHA Citation and Order Manual effective March 19, 1978. In fact, there is no Citation and Order Manual that became effective March 19, 1978. As stated, the March 9, 1978 edition of the Citation and Order Manual is the one that was effective at all relevant times. After due inquiry, I have discovered that this language is not contained in the March 9, 1978 Citation and Order Manual. Instead, the language in question in

¶ 32 comes from the edition of the Citation and Order Manual that became effective November 1, 1982.

> 6. Paragraph 44 of all of the above Complaints purports to refer to language contained on page 49 of the MSHA Citation and Order Manual effective March 10, 1978. There is no MSHA Citation and Order Manual that became effective on March 10, 1978. After due inquiry, I have discovered that the language referred to is not contained in the March 9, 1978 Citation and Order Manual. Instead, the language to which ¶ 44 refers is found in the MSHA Citation and Order Manual that became effective on November 1, 1982.

Plaintiffs do not dispute the accuracy of Fesak's statement. The Court finds that Fesak's statement is true and correct. The portions of paragraphs 22, 32, and 44 of the complaints which purport to cite and quote language from the 1978 MSHA Citation and Order Manual are factually incorrect and will not be taken into consideration in determining whether this Court lacks subject matter jurisdiction under the discretionary function exception to the FTCA. The Court finds that plaintiffs have mistakenly cited to language from the text of a MSHA manual which did not become effective until after the mine explosion which is the subject of the instant lawsuits had already occurred. For the purposes of ruling on the defendant's motions to dismiss, the Court will generally treat all other well-pleaded allegations of fact in the complaints as being true. However, the Court when necessary will refer to records submitted by plaintiff, especially the official report of MSHA's investigation into the mine explosion.

## III. THE FTCA AND THE DISCRETIONARY FUNCTION EXCEPTION

■ The United States is immune from suit under the doctrine of sovereign immunity and can be held liable in tort only to the extent that it has expressly waived sovereign immunity. *United States v. Orleans,* 425 U.S. 807, 813–14, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390 (1976); *Lehman v.*

*Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981); *Dalehite v. United States*, 346 U.S. 15, 30–31, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953). The United States may define the conditions under which it will waive sovereign immunity and permit itself to be sued in tort. *Honda v. Clark*, 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967). The "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957); *see also Lehman*, 453 U.S. at 161, 101 S.Ct. at 2702.

■ The FTCA provides a limited waiver of sovereign immunity making the United States liable for certain torts "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. The FTCA's sovereign immunity waiver is subject to the exceptions contained in 28 U.S.C. § 2680. If one of the express statutory exceptions under § 2680 applies to a claim brought against the United States pursuant to the FTCA, the claim must be dismissed due to lack of subject matter jurisdiction. *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985); *Baird v. United States*, 653 F.2d 437, 440 (10th Cir. 1981).

Section 2680(a) provides that the FTCA shall not apply to:

Any claim based upon an act or omission of an employee of the government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.

■ Congress intended that the discretionary function exception would " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort.' " *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("Varig Airlines"); *see Lockett v. United States*, 938 F.2d 630, 638 (6th Cir.1991)). The United States is immune from liability for damages resulting from an alleged negligent act or negligent failure to act if it involves an exercise of that kind of policy discretion. *Lockett*, 938 F.2d at 638; *Graves v. United States*, 872 F.2d 133, 137 (6th Cir.1989); *Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir. 1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987).

The question to be resolved in the present case is whether the discretionary function exception bars the plaintiffs' claims that the alleged negligent acts and omissions of the MSHA inspectors and employees proximately caused the wrongful death of the coal miners. Various other jurisdictions have considered this question and held that similar claims against the United States under the FTCA based on the alleged negligence of mine inspectors are barred by the discretionary function exception. *Russell v. United States*, 763 F.2d 786 (10th Cir.1985); *Hylin v. United States*, 755 F.2d 551 (7th Cir.1985); *Bernitsky v. United States*, 620 F.2d 948 (3rd Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *Ayala v. United States*, 771 F.Supp. 1097 (D.Colo.1991); *Wallace v. United States Dept. of Labor, MSHA*, 717 F.Supp. 1466 (D.Wyo.1989); *Marn v. United States*, 681 F.Supp. 266 (W.D.Pa.1987); *contra, Collins v. United States*, 783 F.2d 1225 (5th Cir.1986) (Methane gas explosion in coal mine caused death and injuries to miners. Alleged negligence of MSHA inspectors in terminating imminent danger order and failing to reclassify mine as having excessive methane gas levels in accordance with mandatory regulations, thereby permitting mine to remain open, did not fall within discretionary function exception). Although these cases are instructive, they must be considered in

light of the Supreme Court's more recent decisions in *United States v. Gaubert,* 499 U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), and *Berkovitz,* 486 U.S. 531, 108 S.Ct. 1954.

■ The Supreme Court has enunciated several key factors which must be applied when determining whether the discretionary function exception bars a claim against the United States. First, the exception covers only acts that are discretionary in nature involving an element of judgment or choice. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958–59. The requirement of choice or judgment is not satisfied if a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Id.*

■ If the challenged conduct involves an element of judgment, the Court must then determine whether it is the kind of judgment that the discretionary function exception was designed to shield. The exception only protects governmental actions and decisions which are based on public policy considerations. *Id.* at 537, 108 S.Ct. at 1959.

■ Furthermore, the exception encompasses "the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Varig Airlines* 467 U.S. at 813–14, 104 S.Ct. at 2764–65. *Varig Airlines* stands for the proposition that the exception applies to the discretionary acts of inspectors employed by a federal regulatory agency who are responsible for enforcing compliance with federal safety standards. The exception covers not only agencies but all Government employees who exercise discretion. As the Supreme Court stated in *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968:

Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion. (Footnote omitted).

The *Varig Airlines* Court further elaborated on this subject by emphasizing that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.... Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* 467 U.S. at 813, 104 S.Ct. at 2764.

In the case at bar, the Court must resolve the question of whether the MSHA inspectors had the discretion to exercise judgment that is rooted in social, economic, or political policy within the ambit of the discretionary function exception when they inspected the mine and approved the ventilation plan submitted by the mine owner. It is necessary to review in some detail the statutory and regulatory scheme which governs MSHA and its mine safety inspectors. The Court is guided by the following excerpt from the recent decision of the Supreme Court in *Gaubert,* 499 U.S. at ——, 111 S.Ct. at 1274–75, 113 L.Ed.2d at 347–48, wherein the correct standards for evaluating the conduct of persons employed by government regulatory agencies are summarized:

[I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. *See Dalehite, supra,* at 36, 73 S.Ct. 956, 97 L.Ed. 1427. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a dis-

cretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

. . . .

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

(Footnote omitted).

■■■ Plaintiffs in the present case argue that the acts and omissions of the MSHA inspectors do not fall within the discretionary function exception because they occurred at the operational level rather than the planning level. However, the Supreme Court rejected this simplistic method of analysis in *Gaubert*, 499 U.S. at ——, 111 S.Ct. at 1275–76, 113 L.Ed.2d at 348. Discretionary conduct is not confined to the so-called planning level. The day-to-day management of the government's business and its regulatory activities may also require subordinate employees of federal agencies to perform discretionary acts involving choice or judgment founded upon Government policy considerations.

## IV. OVERVIEW OF THE FEDERAL MINE SAFETY AND HEALTH ACT

■■■ The MSHA employees and inspectors operate pursuant to the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 801–878, which was redesignated as the Federal Mine Safety and Health Act of 1977 by Pub.L. 95–164, Title 1, Section 101, 91 Stat. 1290 ("the Act"). MSHA also operates in accordance with the administrative regulations governing coal mine safety and health promulgated pursuant to the Act which are found at 30 C.F.R. Congress has declared that the first priority and concern of the Act is the health and safety of miners. 30 U.S.C. § 801(a). The Act places the primary responsibility for mine safety to prevent dangerous and unhealthy mining practices squarely on the mine operators with assistance from the miners. 30 U.S.C. §§ 801(a), 820.[1] The Act and the regulations do not, however, impose a corresponding mandatory, nondiscretionary duty on MSHA to take specific action in all situations.

■■■ The Act regulates mine operations in essentially two ways. First, the Secretary of Labor promulgates administrative regulations pursuant to 30 U.S.C. § 801 that establish general and mandatory standards with which all mine operators must comply. For example, the regulations require mine operators to compile comprehensive plans addressing particular subjects such as ventilation. 30 U.S.C. § 863 and 30 C.F.R. § 75.316. These plans are submitted to a MSHA district manager for review and approval. Once approved, the plans become mandatory in the sense that a violation of the approved plans is a violation of the Act. *United Mine Workers of Amer., Intern. Union v. Dole*, 870

1. When the government decides the extent to which it will undertake to supervise and regulate the safety procedures of private contractors, it is exercising discretion at one of the highest levels. *Varig Airlines*, 467 U.S. at 819–20, 104 S.Ct. at 2767–68. In *Feyers*, 749 F.2d 1222, the employee of an independent contractor was injured in an operation supervised by the contractor. The employee sued the government for alleged negligent inspection of the contractor's operation of the facility and the Government's alleged breach of a nondelegable duty to pro-

vide a safe work area. The Sixth Circuit affirmed dismissal of the complaint, holding that the government's decision to delegate safety responsibility to the contractor was clearly a discretionary function giving rise to governmental immunity under 28 U.S.C. § 2680(a). The Sixth Circuit also noted that the discretionary function exception does not apply where mandatory regulations are violated by government employees. *Id.* at 1227 n. 7. *See also Totten v. United States*, 806 F.2d 698, 701–702 (6th Cir.1986).

F.2d 662, 667 n. 7 (D.C.Cir.1989). Second, MSHA is authorized to conduct inspections and investigations of mines, and to issue citations and orders to mine operators to enforce their compliance with the safety standards. 30 U.S.C. §§ 813 and 814. After carefully reviewing the Act and the applicable regulations, the Court concludes that MSHA inspectors have the authority to exercise a considerable degree of discretion in the performance of their safety enforcement duties. *See Hylin,* 755 F.2d at 554; *Ayala,* 771 F.Supp. at 1107; *cf., United States v. Consolidation Coal Co.,* 560 F.2d 214, 218 (6th Cir.1977), *vacated and remanded,* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), *judgment reinstated,* 579 F.2d 1011 (6th Cir.1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979).

## V. THE PLAINTIFFS' CLAIMS

With this background in mind, the Court will review each count of the plaintiffs' complaints.

### A. Count One

Count One avers the United States is liable under the tort theory of negligence *per se*[2] because it violated 30 C.F.R. §§ 75.316—75.316-2, which plaintiffs claim imposes a mandatory, nondiscretionary duty upon MSHA to disapprove unsafe, inadequate ventilation plans proposed by coal mine operators. Plaintiffs contend the Grundy Mining Company ("Grundy") submitted a ventilation plan to MSHA in June 1981 which proposed to begin mining operations in Section 003 of the underground mine and proceed from there into an adjacent section of the mine which had been abandoned and inaccessible for years. Plaintiffs refer to this abandoned section of the mine as the "Old Works." Charles Ed Presley ("Presley"), the Chief Mining Engineer of Grundy, mailed the proposed ventilation plan to MSHA District Manager Jer-

ry Spicer on June 5, 1981, with a cover letter which stated in part:

Please find attached the updated 6 months submission showing the location of the 2 existing sections 003 & 007 plus the proposed new section, 008.

Projections for 003 and 007 are the same as those previously submitted except for the connection between each section approximately every 1000′ feet. *Request permission to install an air-lock using double (2) metal doorways between the intake of 003 and the return from 007. Both doors are to be maintained in a closed position when not in use and only one door at a time will be opened.*

(Emphasis supplied).

It is further alleged that MSHA approved Grundy's ventilation plan without first inspecting the mine in person to determine whether the operator's plan was suitable for use and that such a prior in-person inspection is implicitly required by 30 C.F.R. § 75.316.

MSHA approved the ventilation plan on September 21, 1981, and informed Grundy that once it got within 200 feet of the Old Works, Grundy had to drill at least 20 feet ahead of the working coal face to determine whether the Old Works contained dangerous accumulations of water or gas. MSHA District Manager Spicer wrote a letter of approval to Presley dated September 21, 1981, which stated in part:

The Ventilation System and Methane and Dust Control Plan for the above mine submitted in accordance with Subsection 75.316 of the Mandatory Safety Standards, Underground Coal Mines, has been reviewed and is approved for 3 working sections with the following provisions:

1. Drill holes shall be drilled in accordance with Section 75.1701, CFR Part 75, when any working place approaches within the specified distance stated in such section of any abandoned areas or

---

**2.** Defendant argues that plaintiffs cannot prevail on a negligence *per se* theory under the FTCA because there is no private cause of action under Tennessee law for violation of the federal mine safety laws. It is not necessary to address

or rule on this argument because the Court will grant the defendant's motion to dismiss the complaints on the ground of lack of subject matter jurisdiction pursuant to the discretionary function exception, 28 U.S.C. § 2680(a).

abandoned coal mines that cannot be examined safely.

This plan is the basic system followed at this mine and should any major changes be anticipated, they shall be submitted to and approved by the District Manager before being adopted. Should any significant deficiencies be detected in the Ventilation System and Methane and Dust Control Plan during an inspection or investigation, this approval may be revoked.

. . . .

*All provisions of published regulations and criteria pertaining to ventilation and methane and dust control must be followed unless a waiver has been granted in writing by the District Manager.*

(Emphasis supplied). MSHA thus sought to have Grundy comply with 30 C.F.R. § 75.1701 concerning safety standards in abandoned areas of mines. Plaintiffs aver that the warning by MSHA to Grundy to drill ahead as it approached the Old Works, evidences MSHA's awareness that the Old Works posed a dangerous condition to the miners because it could not be adequately inspected and might contain accumulations of explosive gas.

The complaints also allege in Count One that on December 7, 1981, Grundy employees drilled a hole through the working face of Section 003 into the Old Works which contained dangerous quantities of methane gas. Methane is a colorless, odorless gas given off in mines which is highly combustible and can cause a violent explosion when ignited. On the fateful day of December 8, 1981, the plaintiffs' decedents discovered dangerous levels of methane gas in the area of the mine where they were working. A foreman or superintendent of Grundy instructed the miners to cut a large hole into the Old Works thereby allowing more methane gas to spread into the miners work area in Section 003. The mine was improperly ventilated in Section 003 and as a result a methane gas explosion occurred

in Section 003 which asphyxiated and killed the plaintiffs' decedents.[3]

After the explosion, MSHA conducted an investigation. MSHA District Manager Spicer wrote a letter to the Grundy Mining Company dated December 29, 1981, which stated that a review of the ventilation plan previously approved for the mine indicated the plan was inadequate in two respects: (1) the air bleeder system had failed with methane gas migrating to an active section of the mine, and (2) Sections 003 and 007 of the mine were being ventilated by the same split of air. The problem was discussed in more depth in MSHA's official investigative report which states in part:

*003 Section Ventilation*

A split system of ventilation was used for ventilating the three active sections. However, *during the investigation it was discovered that air lock doors or a stopping was missing in a cut-through developed during November 1981, between the return aircourses of 007 section and the intake aircourse in 003 section.* The belt conveyor entries were to be separated from the intake and return aircourses; however, in the 003 section the belt conveyor entry was not separated from the return aircourse outby the belt tailpiece for a distance of about 200 feet. *A permanent stopping, as required by the approved ventilation plan, had not been constructed between the intake and return aircourses,* in the third open crosscut outby the working faces. Also, it could not be determined if a permanent stopping had been constructed in the crosscut between the intake entry and the belt conveyor entry just outby the tailpiece, due to a large roof fall in the area. Plastic check curtains were installed between the intake and return aircourses in the first, second and fourth crosscuts inby the tailpiece. The third crosscut, shuttle car roadway, was open and the air was *short circuited*

---

**3.** MSHA investigated the explosion and concluded that the methane was ignited by a miner using a cigarette lighter.

and was not effectively ventilating the working faces.

(Emphasis supplied).

The MSHA investigative report reaches the following conclusions concerning the lack of adequate ventilation. The Section 007 return aircourse was interconnected to the Section 003 intake aircourses. There were no ventilation controls in this interconnecting entry. Four permanent stoppings had not been erected by the mine operator between the belt entry and return aircourse immediately outby the Section 003 tailpiece. The mine operator also did not erect a permanent stopping between the intake and return aircourse entries in the third connecting crosscut outby the faces of the coal seams being mined. A plastic "check curtain" was not installed by the mine operator between the intake and return air courses in the third crosscut inby the belt tailpiece. Because this check curtain was not installed, the intake air for the coal faces where the drilling or holing into the Old Works occurred was short-circuited to the return aircourses. Therefore, the methane gas which migrated from the Old Works into Section 003 where the miners were working was not effectively diluted, removed, and replaced with fresh air. Simply put, the MSHA investigation revealed that the mine operator, Grundy, had not properly implemented and complied with the ventilation plan as approved by MSHA.

■ Plaintiffs cite 30 U.S.C. § 863(z)(2) which provides that mine operators shall ventilate abandoned areas of mines according to certain standards to dilute and carry away methane gas. The Old Works were inaccessible by MSHA and Grundy prior to the explosion to determine whether the abandoned Old Works section of the mine was properly ventilated.

30 C.F.R. § 75.316 requires coal mine operators to adopt a ventilation system and methane and dust control plan which has to be approved by the Secretary of Labor. Section 75.316–1 enumerates a relatively detailed list of the information and records the coal mine operators shall submit to the MSHA Coal Mine Safety District Manager concerning the ventilation system and methane control plan. Plaintiffs primarily focus their attention on 30 C.F.R. § 75.316–2 which states in its introductory paragraph:

This section sets out the criteria by which District Managers will be guided in approving a ventilation system and dust control plan on a mine-by-mine basis. Additional measures may be required. A ventilation system and dust control plan not conforming to these criteria may be approved, providing the operator can satisfy the District Manager that the results of such ventilation system and dust control plan will provide no less than the same measure of protection to the miners.

■ The remainder of § 75.316–2 sets forth the standards which "should" be followed. The Court concludes that the language used in §§ 75.316–75.316–2 is discretionary in nature rather than mandatory. MSHA employees have room to exercise discretion in approving ventilation and methane control plans submitted by the mine operators. *Cf. Marn,* 681 F.Supp. at 271. The plaintiffs' claim that MSHA had a mandatory, nondiscretionary duty to disapprove unsafe ventilation plans is without merit. MSHA employees had discretion within certain guidelines to determine which ventilation plans should be approved. The record shows that what occurred in the instant case is the mine operator, Grundy, submitted a proposed ventilation plan which requested permission to install airlock doors or stops between the intake aircourse of Section 003 and the return air course of Section 007. The airlock doors were to be kept closed when not in use and only one door at a time would be opened. The MSHA District Manager, exercising his discretion under 30 C.F.R. § 75.316–2, approved this split-system ventilation plan. The MSHA District Manager had the discretion to approve such a ventilation plan if, in his best judgment, the proposed plan would provide the same measure of protection to the miners as set forth in the health and safety regulations. If it later developed that the Grundy ventilation plan was inadequate, then the most plaintiffs can

show is that the MSHA District Manager abused his discretion by approving it. In determining whether the discretionary function exception under the FTCA is applicable, the mere abuse of discretion is immaterial. 28 U.S.C. § 2680(a).

 Plaintiffs aver in paragraph 10 of their complaints that MSHA approved Grundy's ventilation plan without first inspecting the mine in person to determine whether the plan was suitable for use and that such prior in-person inspection is implicitly required by 30 C.F.R. § 75.316. After carefully reviewing the regulations, the Court concludes there is no explicit or implicit mandatory requirement that MSHA must have one of its employees inspect every mine in person, on site for the purpose of determining whether the ventilation plans are suitable to each individual mine prior to approval.

Plaintiffs seek to rely on the affidavit of William Craft who is a former MSHA inspector and district manager. Craft states that as part of standard internal procedures in performing a review of each ventilation plan, MSHA requires on-site inspection of the mine to determine if the plan meets all applicable regulations. According to Craft, included in each inspection are observing and testing the elements of the proposed ventilation plan under actual mining conditions. Craft says that MSHA provides its on-site inspectors who review proposed plans with various standard forms the inspector must complete and file with his recommendation for approval or disapproval of the plan. These internal MSHA forms show the inspector's findings on his tests and observations performed during the on-site plan review. In addition, Craft states that MSHA Underground Manual, p. 11-6, effective March 9, 1978, requires that all "[r]espirable dust control plans shall be evaluated by visual observation and measurements of engineering parameters, such as ... quantity and velocity of the air currents including mean entry velocity, distances, ventilation controls ... are maintained in relation to the faces, etc...."[4]

 Plaintiffs argue that the discretionary function exception under the FTCA does not apply because MSHA inspectors violated mandatory, nondiscretionary internal MSHA staff procedures and the MSHA manual when they failed to conduct tests at the Grundy mine before approving the ventilation plan. The Court disagrees. MSHA's manual and its internal procedures or instructions for its inspectors are not substantive regulations, have no force of law, and are not binding on the United States. *Schweiker v. Hanson,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981). Plaintiffs have not shown that the MSHA manual is anything more than a field-level instructional guide to its employees, and that either the manual or the MSHA internal procedures for its inspectors constitute substantive legislative-type rules which are equivalent to regulations having the force of law. *See, e.g., Cubanski v. Heckler,* 781 F.2d 1421, 1425–27 (9th Cir.1986).

### B. Count Two

 In Count Two, plaintiffs reiterate their allegations, and rely on the same statutes and administrative regulations as in Count One. Plaintiffs contend the United States is liable for negligence under the Good Samaritan doctrine because it undertook the duty to protect the miners from harm by assuming the responsibility pursuant to 30 C.F.R. §§ 75.316—75.316-2 of approving Grundy's ventilation plan. It is alleged the MSHA employees knew Grundy planned to "hole into" and begin mining the Old Works which was not ventilated and might contain dangerous accumulations of methane gas. By approving Grundy's plan and permitting the inaccessible Old Works section to be mined, MSHA failed to exercise reasonable care in undertaking its assumed duty to approve only adequate ventilation plans.

Count Two further avers that by approving Grundy's inadequate ventilation plan,

---

**4.** Plaintiffs have not submitted the MSHA manual and inspection/test forms to the Court for review.

MSHA increased the risk of harm to the miners. The miners relied upon MSHA's approval of the Grundy plan as notification to the miners that the underground coal mine was safely ventilated such that methane gas would continuously be moved away from the Old Works. As a result of their reliance on MSHA, the plaintiffs' decedents were killed in the methane gas explosion.

These claims under Count Two will be dismissed for lack of subject matter jurisdiction. The discretionary function exception applies to claims brought pursuant to the Good Samaritan doctrine. *Barnson v. United States*, 816 F.2d 549, 554 (10th Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). The MSHA decision to approve the Grundy ventilation plan was a discretionary act.

### C. Counts Three and Four

■■■ Counts Three and Four[5] allege MSHA violated 30 U.S.C. § 813(i) by failing to perform required spot inspections. Section 813(i) provides:

> Whenever the Secretary finds that a coal or other mine liberates excessive quantities of methane or other explosive gases during its operations, or that a methane or other gas ignition or explosion has occurred in such mine which resulted in death or serious injury at any time during the previous five years, or that there exists in such mine some other especially hazardous condition, he shall provide a minimum of one spot inspection by his authorized representative of all or part of such mine during every five working days at irregular intervals. For purposes of this subsection, "liberation of excessive quantities of methane or other explosive gasses" shall mean liberation of more than one million cubic feet of methane or other explosive gases during a 24–hour period. When the Secretary finds that a coal or other mine liberates more than five hundred thousand cubic feet of methane or other explosive gases during a 24–hour period, he shall provide a minimum of one spot inspection by his authorized representative of all or part of such mine every 10 working days at irregular intervals. When the Secretary finds that a coal or other mine liberates more than two hundred thousand cubic feet of methane or other explosive gases during a 24–hour period, he shall provide a minimum of one spot inspection by his authorized representative of all or part of such mine every 15 working days at irregular intervals.

Plaintiffs argue that § 813(i) requires MSHA to conduct a minimum of one spot inspection every five working days when the agency finds that an "especially hazardous condition" exists in a mine. It is alleged MSHA knew that an especially hazardous condition existed in the Grundy mine because in calendar year 1980, prior to the December 8, 1981 explosion, the fatality frequency rate at this particular mine was ten times higher than the national average. It is further alleged that MSHA also knew that the old, abandoned workings in the mine were not ventilated and sealed as required by 30 C.F.R. § 75.329. Plaintiffs maintain that MSHA's alleged failure to comply with its mandatory, nondiscretionary duty to perform spot inspections pursuant to § 813(i) breached a duty owed to the miners by the United States and was a proximate cause of their wrongful deaths.

The Court disagrees with the plaintiffs' description of § 813(i) as being nondiscretionary in nature. On the contrary, § 813(i) contains language which permits MSHA to exercise a degree of discretion. It provides that "[w]henever the Secretary finds that ... there exists in such mine some other especially hazardous condition" then MSHA shall begin spot inspections. The statute and regulations do not define "some other especially hazardous condition" leaving this determination up to the Secretary's discretion. MSHA in the present case had discretion to decide whether the Grundy plan to begin mining

---

**5.** Counts Three and Four are based on the same allegations of fact, and the same statutes and regulations. Count Three presents a negligence *per se* claim while Count Four is premised on the Good Samaritan doctrine.

the Old Works constituted a hazardous condition necessitating spot inspections pursuant to § 813(i).

### D. Counts Five and Six

Plaintiffs allege in Counts Five and Six [6] that MSHA violated 30 U.S.C. § 813(a) and its own internal inspection manual when MSHA failed to adequately inspect the mine for safety violations that existed prior to the explosion. Section 813(a) provides:

Authorized representatives of the Secretary or the Secretary of Health and Human Services shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person, except that in carrying out the requirements of clauses (1) and (2) of this subsection, the Secretary of Health and Human Services may give advance notice of inspections. In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections to each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year. The Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws.

For the purpose of making any inspection or investigation under this chapter, the Secretary, or the Secretary of Health and Human Services, with respect to fulfilling his responsibilities under this chapter, or any authorized representative of the Secretary or the Secretary of Health and Human Services, shall have a right of entry to, upon, or through any coal or other mine.

Plaintiffs also quote the following excerpt from the MSHA Underground Manual which became effective March 9, 1978, and was in effect at the time of the mine explosion on December 8, 1981:

Salient parts of a safety and health inspection of the entire mine. Generally, the underground portion of a mine shall be inspected before the surface facilities. Before going underground, inspectors shall examine the record books required to be maintained by the Act and regulations. The Mine Map shall be thoroughly studied with special attention given to mining in close proximity to abandoned workings, oil and gas wells, fuel transmission lines, and surface water which could present an underground flood hazard. Also, where surface mines are present, any danger surface mining may present to underground miners shall be checked. The information obtained from these sources in addition to the information reviewed at the MSHA office should aid the inspector in determining what area of the mine needs immediate attention.

The inspector is required to inspect every working place in the mine which shall include all active haulageways; entrances to abandoned workings; accessible old workings; aircourses; escapeways; other places where miners work or travel; electric equipment and installations; haulage facilities including hoisting equipment; first-aid equipment; ventilation facilities; communication installations; roof and rib conditions; blasting practices; fire hazards; fire protection

---

**6.** Count Five is a negligence *per se* claim and Count Six is based on the Good Samaritan doctrine.

equipment; potable water; and sanitary facilities. Also, he is required to test for the presence of methane and for oxygen deficiency; to collect samples of mine air for analysis to determine the quality of the air with respect to noxious or explosive gases and oxygen content; to collect samples of dust for analysis to determine incombustible content; and conduct noise surveys. The inspector shall not search anyone for matches, lighters or smoking materials. However, the inspector should determine whether an adequate search program exists.

Plaintiffs contend MSHA has a mandatory, nondiscretionary duty pursuant to 30 U.S.C. § 813(a) to inspect each underground coal mine in its entirety to determine whether an imminent danger exists and whether there is a compliance with the mandatory health or safety standards. MSHA inspected the Grundy mine before the December 8, 1981 explosion but did not issue citations to Grundy for any of the violations which MSHA found in its investigation after the explosion. According to plaintiffs, the most important unsafe condition which existed in the Grundy mine in 1981 was the ineffective air "bleeder" system in the Old Works.

It is further alleged by plaintiffs that MSHA's manual sets forth the mandatory procedures that inspectors must follow upon inspecting an entire underground coal mine. The manual requires inspectors to study the mine map with special attention given to mining in close proximity to abandoned works. Inspectors are also required by the MSHA manual to inspect every working place in the mine including entrances to abandoned old workings and other places where miners work or travel. In October 1981, MSHA was at the Grundy mine to conduct one of its mandatory inspections but it is alleged MSHA negligently violated § 813(a) and its own manual by failing to adequately inspect the entire mine. Plaintiffs assert that if MSHA had conducted this inspection according to the nondiscretionary guidelines in its underground mine inspection manual, MSHA would have assured itself and the miners

that the Grundy mine was properly ventilated.

The Court disagrees with the plaintiffs' contention that MSHA inspectors have no discretion when inspecting underground mines. No statute, regulation, or MSHA manual imposes an affirmative duty upon MSHA to so thoroughly inspect a coal mine that each and every violation of the law must be discovered and the mine operator cited. 30 U.S.C. § 801(e) places the primary responsibility for compliance with the safety standards on the mine operators with the assistance of the miners.

Indeed, Congress recognized that MSHA could not be required to discover the existence of every unsafe condition in every mine in the United States during its inspections. This is borne out by 30 U.S.C. §§ 813(f) and (g), which provide that miners and mine operators accompany the MSHA inspector to aid in the inspection, and afford miners the opportunity to request immediate inspection when they believe a standard is being violated. There are no regulations requiring MSHA to police the mining industry to the extent of discovering and preventing every mine operator from using every piece of equipment which may violate MSHA regulations. Such a requirement would exceed the capabilities of the agency and throw into question the feasibility of the regulatory scheme. *Wallace v. U.S. Dept. of Labor, MSHA,* 717 F.Supp. 1466, 1468 (D.Wyo.1989).

As in *Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, plaintiffs here challenge the negligent failure of federal inspectors to discover noncompliance with a mandatory safety regulation. In making a determination whether the discretionary function exception applies, it is immaterial whether MSHA was in fact negligent. *Varig Airlines* teaches that we must examine the nature of the governmental activity being challenged. If the regulatory inspection and enforcement activities of MSHA require its employees to exercise discretion in performing their work, the discretionary function exception bars tort claims against the United States based

upon those performances. The Court has reviewed 30 U.S.C. §§ 814, 815, 817, 818 and 820 concerning the issuance and enforcement of citations and orders by MSHA. These statutes entrust MSHA inspectors with discretion in the first instance to determine whether the violation of a safety standard has occurred and whether the violation poses an "imminent danger." *Cf. Cunningham v. United States*, 786 F.2d 1445 (9th Cir.1986); *Daniels v. Black Mountain Spruce, Inc.*, 676 F.Supp. 220 (D.Colo.1987). The Secretary of Labor and MSHA also have some discretion to determine the appropriate means of enforcing its citations and orders for the protection of the miners. The discretionary function exception may be applied even though MSHA is required to inspect the entire mine. *Hylin*, 755 F.2d at 557.

Decisions regarding the issuance of citations and orders of withdrawal, and the setting of time limits for the abatement of violations must be made by the individual inspectors on the basis of their experience and judgment, and consequently fall within the discretionary function exception. "Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments." *Bernitsky*, 620 F.2d at 955 (citations omitted). Thus, in making a determination of the correct course of action to follow, a MSHA inspector must use his or her judgment as to the manner in which the statutory authority can best be effectuated, an act which cannot subject the United States to tort liability under the FTCA. *Id.*

*E. Counts Seven, Eight, Nine and Ten*

In Counts Seven through Ten,[7] plaintiffs allege MSHA violated 30 U.S.C. § 814(d)(1) which provides:

If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such

violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter. If, during the same inspection or any subsequent inspection of such mine within 90 days after the issuance of such citation, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) of this section to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

In Counts Seven and Eight of their complaints, plaintiffs also allege MSHA violated 30 U.S.C. § 814(e) which provides:

(1) If an operator has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards, he shall be given written notice that such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all per-

---

**7.** Counts Seven and Nine are negligence *per se* claims. Counts Eight and Ten are based on the

Good Samaritan doctrine. All of these counts rest on the same factual allegations.

sons in the area affected by such violation, except those persons referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine health or safety hazard. The withdrawal order shall remain in effect until an authorized representative of the Secretary determines that such violation has been abated.

(3) If, upon an inspection of the entire coal or other mine, an authorized representative of the Secretary finds no violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine health and safety hazard, the pattern of violations that resulted in the issuance of a notice under paragraph (1) shall be deemed to be terminated and the provisions of paragraphs (1) and (2) shall no longer apply. However, if as a result of subsequent violations, the operator reestablishes a pattern of violations, paragraphs (1) and (2) shall again be applicable to such operator.

(4) The Secretary shall make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists.

Plaintiffs contend that if MSHA had properly inspected the Grundy mine prior to the December 8, 1981 explosion, MSHA would have cited Grundy for both "signifi-

cant and substantial" and "unwarrantable" violations of mandatory health or safety standards. Furthermore, MSHA would have found a pattern of violations and ordered Grundy to withdraw the miners from the affected area of danger until the unsafe conditions were abated. It is alleged that by allowing the plaintiffs' decedents to remain in the Grundy mine in the Fall of 1981 when MSHA either knew or should have known Grundy was violating mandatory standards, MSHA breached its mandatory directives to order the withdrawal of miners from the mine which proximately caused their wrongful deaths.

The Court has reviewed §§ 814(d)(1) and (e). For the reasons previously expressed in this opinion, the Court concludes that MSHA inspectors necessarily exercise discretion to determine whether a violation exists, whether the violation is "significant and substantial" and "unwarrantable," whether the mine operator has a pattern of violations, and whether such violations have been satisfactorily abated. All of these decisions by the inspectors involve the element of individual judgment.

### F. Counts Eleven and Twelve

It Counts Eleven and Twelve,[8] MSHA is alleged to have violated 30 U.S.C. § 817(a) which provides:

If, upon any inspection or investigation of a coal or other mine which is subject to this chapter, an authorized representative of the Secretary finds that an imminent danger exists, such representative shall determine the extent of the area of such mine throughout which the danger exists, and issue an order requiring the operator of such mine to cause all persons, except those referred to in section 814(c) of this title, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger and the conditions or practices which caused such imminent danger no longer exist. The issuance of an order under this subsection shall not

---

**8.** Count Eleven claims negligence *per se* and Count Twelve is a claim under the Good Samar-

itan doctrine premised on the same factual allegations.

preclude the issuance of a citation under section 814 of this title or the proposing of a penalty under section 820 of this title.

Plaintiffs contend that when MSHA issued citations to Grundy after the explosion for various violations, many of the inspectors explicitly or implicitly found that an imminent danger had existed in the mine. Post-explosion citations were given for the improper use or location of power connections and also impermissible use or repair of electric face equipment in the mine section where methane gas accumulated. If MSHA had properly conducted its October 1981 quarterly inspection or had implemented a spot inspection program as required by 30 U.S.C. § 813(i), plaintiffs allege MSHA would have found and cited Grundy for "imminent danger" violations. MSHA either knew or should have known that imminent danger violations existed in the mine before December 8, 1981, and MSHA should have ordered Grundy to withdraw all persons from the mine in the section near the Old Works. Plaintiffs claim § 817(a) imposed upon MSHA a mandatory, nondiscretionary duty to order mine operators to withdraw all persons in areas where imminent danger exists until it is abated.

The Court has reviewed § 817(a), and for the reasons previously expressed herein, the Court concludes that MSHA inspectors necessarily exercise discretion and individual judgment in determining whether a violation exists, whether the violation constitutes an "imminent danger," the extent of the area in the mine where the danger exists, and whether the conditions or practices which caused the imminent danger no longer exist. *Hylin*, 755 F.2d at 554; *Marn*, 681 F.Supp. at 270. The Act contains the following definition: "imminent danger means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated." 30 U.S.C. § 801(j). The use of the

phrase "could reasonably be expected" in defining the term "imminent danger" does not establish a mandatory, nondiscretionary standard which requires all federal mine inspectors to take the same actions in all instances. The mine inspectors must exercise reasonable discretion and judgment based on the safety standards and their experience to determine whether a relatively loosely defined imminent danger exists.

### G. Counts Thirteen and Fourteen

In Counts Thirteen and Fourteen [9] of their complaints, plaintiffs allege that MSHA violated 30 U.S.C. §§ 814(a) and (b) which provide:

(a) Issuance and form of citations; prompt issuance

If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of the chapter, standard, rule, regulation, or order alleged to have been violated. In addition, *the citation shall fix a reasonable time for the abatement of the violation.* The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter.

(b) Follow-up inspections; findings

If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a violation described in a citation issued pursuant to subsection (a) of this section has not been totally abated within the

---

9. Count Thirteen is a negligence *per se* claim and Count Fourteen is a claim under the Good Samaritan doctrine based on the same facts.

period of time as originally fixed therein *or as subsequently extended,* and (2) *that the period of time for the abatement should not be further extended,* he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons, except those persons referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(Emphasis supplied).

When MSHA conducted its quarterly inspection of the Grundy mine in October 1981, and during its various other inspections of the same mine in the Fall of 1981, MSHA cited Grundy for violating 30 C.F.R. § 75.403 which provides:

> Where rock dust is required to be applied, it shall be distributed upon the top, floor, and sides of all underground areas of a coal mine and maintained in such quantities that the incombustible content of the combined coal dust, rock dust, and other dust shall not be less than 65 per centum, but the incombustible content in the return air-courses shall be no less than 80 per centum. Where methane is present in any ventilating current, the per centum of incombustible content of such combined dusts shall be increased 1.0 and 0.4 per centum for each 0.1 per centum of methane where 65 and 80 per centum, respectively, of incombustibles are required.

The MSHA inspector in his citation stated that analytical results from 15 of 18 dust samples that MSHA collected on section 007 in the Grundy mine showed that the rock dust applications used by Grundy just 15 days before the December 8, 1981 explosion in order to prevent the ignition of coal dust in mine section 007 were inadequate and substandard. The MSHA inspector gave Grundy one week to apply more rock dust. On December 1, 1981, the MSHA inspector returned to the mine and found that Grundy had not applied additional rock dust in the deficient area. Furthermore, 30 C.F.R. § 75.1100–2(i) provides that there shall be readily available at the mine at least five tons of rock dust. However, these five tons of rock dust were not present at the Grundy mine during the Fall 1981 inspections by MSHA.

Plaintiffs allege that during the period of time from December 1, 1981, through December 8, 1981, MSHA did not cite Grundy as required by 30 U.S.C. § 814(a), or close down the mine as required by 30 U.S.C. § 814(b), for coal dust violations. Instead, a MSHA inspector extended the time limit for Grundy to obtain sufficient rock dust at the mine. Soon after the December 8, 1981 explosion, MSHA found that 80% of the rock dust samples were substandard, the coal dust in the Grundy mine was volatile and explosive, and the coal dust played a part in the fatal explosion.

Plaintiffs argue that 30 U.S.C. §§ 814(a) and (b) impose a mandatory, nondiscretionary duty on MSHA to issue citations and, upon a violation of such citations by the mine operator, to prohibit unauthorized persons from entering dangerous areas of the mine affected by the citations. If MSHA had conducted its rock dust inspections properly and cited Grundy for deficient rock dusting, it would have prevented coal dust from participating in causing the explosion on December 8, 1981. Moreover, plaintiffs allege that MSHA's negligent failure to order withdrawal of the miners from the Grundy mine as required by 30 U.S.C. § 814(b), proximately caused the wrongful death of the miners.

The Court concludes that the discretionary function exception does apply to Counts Thirteen and Fourteen. Section 814(a) provides that a MSHA inspector shall with reasonable promptness issue a citation to the mine operator if he *believes* that there is a violation of a health or safety standard, rule, regulation or order. The use of the term "believes" in § 814(a) implies that MSHA inspectors exercise judgment or choice in formulating their belief. *Ayala,* 771 F.Supp. at 1110. A MSHA inspector cited Grundy for the rock dust safety violation. The crux of the

plaintiffs' claim is that the MSHA inspector should not have granted additional time to Grundy to abate the violation. The MSHA inspector had the right under §§ 814(a) and (b) to exercise his discretion and individual judgment to fix a reasonable time for the abatement of the violation and to also extend the time for abatement. The statutes and regulations do not establish mandatory time limits or deadlines that MSHA must comply with in all situations. Each safety or health violation must be considered and resolved on a case-by-case basis depending on the unique circumstances present in each individual mine.

### H. Discretionary Acts of MSHA Inspectors Involve Policy Judgment

■ Plaintiffs argue that even if MSHA employees have discretion under the statutes and regulations in performing their work, it is not the type of discretion which is grounded in social, economic, or political policy which falls within the ambit of the discretionary function exception. However, the Supreme Court in *Gaubert,* 499 U.S. at ——, 111 S.Ct. at 1274–74, 113 L.Ed.2d at 347–48, held that when established governmental policy, as expressed or implied by statute or regulation, allows an employee of the United States to exercise discretion, there is a strong presumption that the employee's acts are grounded in the policy when exercising that discretion. *See, e.g., Fazi v. United States,* 935 F.2d 535, 538 (2d Cir.1991); *Redmon By and Through Redmon v. United States,* 934 F.2d 1151, 1156 (10th Cir.1991). This strong presumption is applicable in the present case. After considering the Supreme Court's decision in *Gaubert,* this Court holds that the discretionary acts of the MSHA employees are protected under the discretionary function exception because they are deemed to be in furtherance of the governmental policies or goals which led to the enactment of the Act and the promulgation of the mine safety and health regulations. Accordingly, the complaints will be dismissed on the ground of lack of subject matter jurisdiction.

### VI. DEFENDANT'S MOTION TO DISMISS UNDER FED.R.CIV.P. 12(b)(6)

The defendant's motion pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss the plaintiffs' claims premised upon the negligence *per se* theory and the Good Samaritan doctrine will be DENIED as MOOT. The Court has already determined the complaints should be dismissed in their entirety for lack of subject matter jurisdiction. It is not necessary to become involved in a superfluous discussion and interpretation of Tennessee law on these questions which are not determinative of the outcome of this case.